**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH E. HUDAK,          )
                                    )
            Plaintiff,        )        Docket No. 1:06-cv-110-SJM
                                    )
      v.                      )
                                    )
BRAD FOULK,            )
                                    )
            Defendant.    )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District J.,

     This civil rights action arises out of five criminal cases that were filed against the Plaintiff, Joseph E. Hudak, in the Court of Common Pleas of Erie County, Pennsylvania. Brad Foulk, the only named Defendant in this action, is the District Attorney of Erie County. Plaintiff is an attorney who formerly practiced law in the area of criminal defense matters. His main office was in Pittsburgh, but he also maintained a satellite office in Erie. After Plaintiff was unsuccessfully prosecuted by Foulk's office for the alleged theft of clients' funds, Plaintiff commenced this lawsuit. As matters currently stand, Plaintiff asserts three claims against Foulk under 42 U.S.C. §§ 1983 and 1985 for the alleged violation of his civil rights which he claims occurred in connection with the criminal proceedings. The essence of Plaintiff's complaint is that Foulk acted at the direction of and/or in conspiracy with Judge William R. Cunningham of the Erie County Court of Common Pleas in filing the criminal charges against Plaintiff and in causing his arrest. Plaintiff also complains about certain comments that Foulk made to the media in reference to the criminal charges.

     Presently pending before me is Foulk's motion for summary judgment on all counts. For the reasons set forth below, the motion for summary judgment will be granted.

# I. BACKGROUND[1]

*Plaintiff's Representation of Frederick Dean*

On May 19, 2003, Plaintiff appeared before the Honorable Shad Connelly of the Erie County Court of Common Pleas for a jury trial in the criminal case of *Commonwealth v. Frederick Dean*, No. 1609 of 2002. Prior to the opening of court, Plaintiff caught the attention of Deputy Sheriff Brian Copley, who perceived that Plaintiff appeared disheveled and very flushed and smelled of alcohol. (Def.'s Appendix in Supp. of Mot. for Summary Judg. ("App.") at 489 [59-14].)[2] Deputy Sheriff Copley brought his concerns to the attention of Judge Connelly. (Id.) With the Judge's approval, Deputy Sheriff Copley administered a portable Breathalyzer test (PBT), which indicated that Plaintiff had a blood alcohol level of .04%. (Id.) Judge Connelly discussed this reading with Plaintiff privately in chambers and concluded that the level was so negligible as to be consistent with the use of mouthwash. (App. at 46-47

---

[1] The events which form the backdrop to these criminal charges are in certain respects hotly contested. Where the facts are in dispute, we accept Plaintiff's version of events which, in substantial part, comes from his own deposition testimony. Ultimately, however, none of the facts which are in dispute are material to our resolution of the instant motion.

In discussing and reviewing the pending motion, we apply the well-established standards which pertain when relief is requested under Rule 56. Summary judgment is proper only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Carrasca v. Pomeroy*, 313 F.3d 828, 832-33 (3d Cir.2002). In addition, we are required to view the evidence of record in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir.2007) (citation omitted).

[2] Defendant's appendix in support of his motion for summary judgment (hereinafter, "App.") consists of some 529 pages contained in twelve separate attachments to his dispositive motion, designated on the docket sheet as document numbers 59-4 through 59-15. References will be made to the relevant appendix number and the accompanying document number at which it is contained.

[59-5].)  Judge Connelly further concluded that Plaintiff was not under the influence of alcohol and that he was fit to participate in Mr. Dean's trial.  (Id.)  Plaintiff tried the case and ultimately won an acquittal for Mr. Dean.  (App. 488 [59-14].)

*Plaintiff's Representation of Eugene Case*

In late May, 2003, Plaintiff was retained by Phyllis Case to represent her son, Eugene Case, who was being detained in the Erie County Jail, ostensibly for a probation violation.  According to Plaintiff, the basis for Eugene's detention was not immediately clear, as it appeared that Mr. Case might also have violated a prior DUI-related license suspension, which would have carried a penalty of mandatory imprisonment.  (App. 33-34 [59-4].)  On May 21, 2003, Plaintiff accepted a payment of $400.00 to look into the matter and gave Phyllis Case a written fee agreement which stated that additional legal fees might be imposed if it turned out that additional hearings were required.  (App. 34 [59-4]; 484 [59-14].)

While preparations were being made to file a motion to lift Mr. Case's probation detainer, Phyllis Case called Plaintiff's Pittsburgh office on May 29, 2003 at approximately 3:00 or 4:00 in the afternoon to advise that her son was scheduled to appear the following morning before the Honorable William R. Cunningham, then-President Judge of the Erie County Court of Common Pleas.  (App. 34-35 [59-4]; 484 [59-14].)  Unbeknownst to Plaintiff, Mrs. Case had appeared at Plaintiff's Erie office and paid $500.00 to cover the cost of attendance at the hearing.  (App. 35 [59-4].)  Plaintiff, who had been out of his Pittsburgh office during the day, returned to learn of the hearing that had been scheduled before Judge Cunningham for the following morning, which conflicted with other appearances that Plaintiff had already scheduled in Pittsburgh for that day.  (Id.)  In light of these events, Plaintiff contacted Judge Cunningham's chambers late in the afternoon on May 29 and requested a one-day postponement of the detention hearing; however, Judge Cunningham refused the

3

continuance.  Plaintiff then attempted to get other counsel to cover the hearing but was unsuccessful.  (App. 35-36 [59-4].)

On May 30, Eugene Case's scheduled revocation hearing went forward and Plaintiff did not appear.  Because Mr. Case wanted to exercise his right to counsel, Judge Cunningham rescheduled the revocation proceeding for a later date.  What happened next is matter in dispute.  According to Judge Cunningham, a Rule to Show Cause was issued, requiring Plaintiff to appear in court on June 25, 2003 for the purpose of determining whether Plaintiff should be held in contempt of court for failing to appear at the May 30 revocation proceeding.  (App. 484 [59-14].)  Judge Cunningham has represented that this notice was sent to Plaintiff in the standard course of procedure from the Court Administrator's office.  (Id.)  Plaintiff, however, maintains that he never received the Rule to Show Cause and, moreover, suggests that no such hearing was actually scheduled.  (App. 36-37 [59-4].)  Plaintiff notes that the docket relative to his contempt proceedings does not reflect that the Rule to Show Cause was ever entered of record.[3]  (Id.; App. 492 [59-14].)  In any event, Plaintiff did not attend the June 25 Show Cause hearing.

On the following day, June 26, 2003, Plaintiff was scheduled to appear for a contempt hearing in front of the Hon. John A. Bozza,[4] also of the Erie County Court of Common Pleas.  Following that hearing, Plaintiff was arrested in the courthouse on a bench warrant issued by Judge Cunningham and placed in a holding cell.  (App. 37 [59-4]; 484 [59-14].)  At 1:39 p.m. that day, Judge Cunningham filed a notice with the

---

[3] Plaintiff's contempt proceedings arising out of the Eugene Case matter are docketed at Erie County Court of Common Pleas Miscellaneous No. 1665 of 2003. (*See* App. 492 [59-14].)  The docket does not reflect that a Rule to Show Cause hearing was scheduled for June 25, 2003.  Whether or not any relevant entries appear on the docket for *Commonwealth v. Eugene Case*, No. 598 of 2002, is not clear because that docket has not been made a part of this record.

[4] Though the details of that hearing are not part of this record, it appears that Judge Bozza did not find Plaintiff in contempt of court.

4

clerk of court stating that a hearing would be held at 4:00 p.m. for the purpose of determining whether Plaintiff should be held in contempt of court as a result of his failure to appear on May 30. (App. 491 [59-14].) Plaintiff was brought before Judge Cunningham that afternoon and, at the conclusion of the hearing, was found to be in contempt of court. Judge Cunningham ordered Plaintiff to pay a $500 fine, to issue a written letter of apology to both Eugene and Phyllis Case, and – in the event Mr. Case no longer wanted Plaintiff to represent him – to refund his client the amount of $900.00 within twenty-four hours. Plaintiff paid the fine and did not appeal the order. (App. 37-38 [59-4]; 484-485, 492 [59-14].)

*Plaintiff's Representation of Mark Pollard*

In late 2002, Plaintiff was hired to represent an individual named Mark Pollard. Mr. Pollard had been charged with criminal conspiracy, robbery and terroristic threats in the Erie County Court of Common Pleas.[5] Following his conviction and sentencing by Judge Cunningham, Mr. Pollard took a *pro se* appeal to the Pennsylvania Superior Court. The Superior Court docket reflects that the appeal was dismissed on November 26, 2002 as a result of Mr. Pollard's failure to comply with Rule 3517 of the Pennsylvania Rules of Appellate Procedure. *See Commonwealth v. Mark Pollard*, 1760 WDA 2002. Plaintiff filed an appearance on behalf of Mr. Pollard in the Superior Court on December 2, 2002 and got the appeal reinstated. *Id*. Plaintiff also sought, and was granted, three extensions of time in which to file a brief on Mr. Pollard's behalf; however, no brief was ever filed, resulting in a dismissal of the appeal on June 4, 2003. *Id*.

---

[5] These factual events are gleaned from the official docket of Mr. Pollard's appeal before the Pennsylvania Superior Court in *Commonwealth v. Pollard*, 1760 WDA 2002, of which we take judicial notice. *See* Fed. R. Evid. 201.

5

*The Disciplinary Board Proceedings*

Shortly after these events, Plaintiff became the subject of disciplinary proceedings before the Pennsylvania Supreme Court. On July 29, 2003, Judge Cunningham submitted an affidavit to the Office of Disciplinary Counsel discussing Plaintiff's conduct relative to his representation of Frederick Dean, Eugene Case, and Mark Pollard. As to the Frederick Dean matter, Judge Cunningham alleged that:

> [o]n May 19, 2003, Attorney Hudak appeared before the Honorable Judge Shad Connelly in Erie County under the influence of alcohol for a criminal jury trial. He was administered a PBT. Attorney Hudak attributed the alcohol reading to the use of mouthwash. There were no sanctions imposed by Judge Connelly. ...[6]

(App. 483 [59-14].)

With regard to the Eugene Case matter, Judge Cunningham discussed his version of the events leading up to the contempt proceedings, and wrote the following:

> As the record reflects, Attorney Hudak took the sum of $400.00 from Mrs. Case on May 21, 2003 promising to take legal action to have her son's probation detainer lifted. The docket reflects he did nothing. There was no motion filed nor did he contact a probation officer in charge of the case nor did he check with the Court to ascertain when a revocation hearing was scheduled. When Mrs. Case called his office to inform him of the revocation hearing, he then took from her another $500.00 to appear at a revocation hearing. Hence, as of May 30, 2003, Attorney Hudak had taken the sum of $900.00 from Mrs. Case and had not made any effort nor filed any documents to have her son released. In fact to this date, the

---

[6] Plaintiff strongly denies that he was under the influence of alcohol. In support of his position, he cites a letter from Judge Connelly, dated August 27, 2003, which states, in relevant part, as follows:

Dear Attorney Hudak:

A representative of the Disciplinary Board called me several weeks ago concerning Judge Cunningham's affidavit and I informed him it was inaccurate, that you were not under the influence, that you conducted yourself in a professional manner, and that you won an acquittal for your client.

If you need me to do anything further please let me know.

(See App. 488 [59-14].)

record reflects he never did anything for his client. Unfortunately for Eugene Case, he remained in jail until his re-scheduled revocation hearing on June 30, 2003 at which time he was represented by Attorney Schroeder (who is not affiliated with Attorney Hudak).

When viewed in the eyes of the consumer, namely Phyllis and Eugene Case, our profession has not been well served by Attorney Hudak. I am sure Phyllis Case and Eugene Case fully expected Attorney Hudak to appear on May 30, 2003 after they had paid him $900.00. We have had many occasions in Erie County (and I suggest in all 67 counties) to prosecute contractors who take money from homeowners and then never perform any of the promised work. Attorney Hudak is similarly situated in that he took $900.00 from Phyllis Case promising to take action to get her son released and then never did anything.

(App. 485 [59-14].)

As to Plaintiff's representation of Mark Pollard, Judge Cunningham alleged that,

the appeal got dismissed because Attorney Hudak failed to file a brief. As you can see from the record of the contempt hearing on June 26, 2003, Attorney Hudak tried to claim the appeal was dismissed because the client failed to file a Statement of Matters Complained of on Appeal. Contrary to Attorney Hudak's testimony, the Superior Court Order specifically states the appeal is dismissed for his failure to file a brief.

(App. 486 [59-14].)

Judge Cunningham sent his affidavit to Attorney Richard Levine of the Office of Disciplinary Counsel. In his cover letter, Judge Cunningham opined that "disciplinary action needs to be taken immediately," and expressed his "appreciat[ion] [for] the effort [being made] towards that end." (App. 482 [59-14].)

On October 3, 2003, the Pennsylvania Supreme Court issued an order which, among other things, temporarily suspended Plaintiff's license to practice law, directed the Office of Disciplinary Counsel to file a petition for discipline within thirty days, and ordered that the matter be assigned to a hearing committee for accelerated disposition. *See Office of Disciplinary Counsel v. Hudak*, 839 A.2d 170 (Pa. 2003).[7] Two Petitions

---

[7] Pursuant to a *per curiam* order entered on February 18, 2004, this Order of Temporary Suspension was later dissolved on the ground that the underlying allegations upon which the Court had relied in initially ordering the suspension were not included in the Petition for Discipline later filed on November 3, 2003. *See Office of Disciplinary Counsel v. Hudak*, 847 A.2d 656 (Pa. 2004).

for Discipline were filed against Plaintiff by the Office of Disciplinary Counsel on November 3 and November 18, 2003 and were subsequently joined. A three-person hearing committee was empaneled and hearings were held over five days in December of 2003 and January of 2004. These proceedings culminated in the committee's report of April 30, 2004, which found that Plaintiff had violated Rules 1.3, 1.4(a), 1.16(d), and 8.4(c) of the Rules of Professional Conduct and recommended that Plaintiff's license to practice law be suspended for a period of two years. (App. 494-495 [59-15].)

Plaintiff filed exceptions to this recommendation and oral argument was held before a three-member panel of the Disciplinary Board. The matter was subsequently adjudicated by the full Disciplinary Board at its July 17, 2004 meeting. (App. 495-496 [59-15].)

On October 25, 2004, the Board issued its report and recommendations, which have been incorporated as part of this record. In its report, the Board opined that Plaintiff had engaged in a "disturbing pattern of dereliction" and that he had "knowingly and intentionally accepted a volume of cases beyond his capacity to deal with." (App. 523 [59-15].) It noted that some 46 complaints had been filed with the Office of Disciplinary Counsel against Plaintiff since June of 2002, most of which alleged a failure by Plaintiff to communicate with his clients, failure to show at meetings or to appear in court at scheduled proceedings, and failure to return unearned fees. (App. 515 [59-15].) The Board recounted that Judge Cunningham had testified at the disciplinary hearings and had presided over four cases involving Plaintiff. (App. 516 [59-15].) According to its report, "Judge Cunningham saw a pattern of promises made to clients with no resulting action." (*Id*.) The Board further noted that the Pennsylvania Lawyers Fund for Client Security had paid $9,093.81 in claims filed against Plaintiff, none of which had been reimbursed to the Fund. (*Id*.) Ultimately, the Board concluded that Plaintiff had committed professional misconduct relative to matters involving eight different clients, including Eugene Case and one Joanne Catron, also a resident of Erie County. (App. 517-519 [59-15].) Based on these violations, the Board recommended a

8

two-year license suspension with credit for four and one-half months previously served. (App. 526 [59-15].)

Although Plaintiff's requests for further review by the Pennsylvania Supreme Court were denied, the Court ultimately declined to adopt the recommended two-year suspension. Instead, in a *per curiam* order issued on March 1, 2005, the Court ordered that Plaintiff be suspended from the practice of law for one year and one day, with credit for the suspension previously served. *See Office of Disciplinary Counsel v. Hudak*, 868 A.2d 1195 (Pa. 2005) (*per curiam*, at App. 527 [59-15]).

*The Criminal Charges*

Plaintiff's difficulties did not end there. On March 16, 2005, five criminal complaints were filed against him in Erie County relative to his handling of five separate clients: Eugene Case, Mark Pollard, Joanne Catron, David O'Connell, and Kelly Makela. (*See* App. 423-447 [59-13], 448-472 [59-14].) Four of the complaints were filed by Detective Jessica L. Lynn of the Erie County Detectives Bureau – an arm of the District Attorney's office, while the fifth was filed by Trooper Susan Edelman of the Pennsylvania State Police. (*Id*.) Each of the complaints charged Plaintiff with violating 18 Pa.C.S.A. § 3921, entitled "Theft by Unlawful Taking or Disposition," and alleged that, after accepting payment of a retainer or fee, Plaintiff did not perform the legal services for which he had been hired and did not refund the client's money when asked to do so. (*Id*.) In each case, the complaint was accompanied by an affidavit of probable cause that was submitted to a district justice, resulting in the issuance of an arrest warrant. (*Id*.)

Ultimately, the case involving Plaintiff's representation of Kelly Makela was nolle prossed by the District Attorney's office. (App. 442-447 [59-13], 448-449 [59-14].) The case concerning Plaintiff's representation of Joanne Catron proceeded to trial, resulting

in Plaintiff's acquittal.  (App. 463-472 [59-14].)[8]  As to the remaining three cases, they were dismissed in the Court of Common Pleas after Judge Bozza granted Plaintiff's motions for habeas corpus relief.  (App. 425-429, 433-438 [59-13]; 453-458 [59-14].) The Commonwealth appealed those dismissals and, on February 15, 2007, the Superior Court affirmed Judge Bozza's rulings.[9]  (App. 473-481 [59-14].)  The Superior Court agreed with Judge Bozza's conclusion that, in the three cases under consideration, the Commonwealth could not prove that Plaintiff had unlawfully taken or exercised control over the property of another, as the statute requires:

> [T]he Commonwealth cannot prove that there was an unlawful taking where the money was exchanged as advanced payment under a contract for legal services.  At that point, [Plaintiff's] duty was to perform the legal services requested, and his failure to perform would constitute a breach of that contract with its proper remedy in the civil forum.  Where the funds were not obtained under an agreement or other known legal obligation to make a specified application of those specific funds, the sole interest that the client has in the funds is a right to future performance pursuant to the contract.  It is thus clear that the funds do not belong to "another," and one cannot be charged under 18 Pa.C.S.A. § 3921 with theft of property to which he has not only rightful possession, but also title, unless the evidence supports a finding of guilt under 18 Pa.C.S.A. § 3922 for theft by deception.

*Commonwealth of Pennsylvania v. Hudak*, Nos. 259 WDA 2006, 541 WDA 2006 542 WDA 2006 (Pa. Super. Feb. 15, 2007) (non-precedential opinion) at App. 479-480 [59-14].

*The Bankruptcy Proceedings*

Meanwhile, Plaintiff's financial difficulties led to his filing for bankruptcy protection in January of 2005.  On March 27, 2006, he filed a *pro se* complaint against

---

[8] That case also involved a charge of forgery, which was ultimately *nolle prossed* by the Commonwealth.  (App. 463-472 [59-14].)

[9] It is apparently the Commonwealth's intention to petition the Superior Court for reargument and, if necessary, to file a petition for allocatur before the Pennsylvania Supreme Court.  However, these events, if indeed they come to pass, are not material to our ruling here.

Foulk in the bankruptcy court, asserting a claim for defamation and seeking damages in excess of $1,000,000.00. Pursuant to 28 U.S.C. § 157(d), reference of the adversary proceeding was subsequently withdrawn to this Court, which has jurisdiction over the dispute pursuant to 28 U.S.C. § 1334(b).

On November 2, 2006, Plaintiff filed an amended complaint against Foulk asserting four separate theories of liability under 42 U.S.C. §§ 1983 and 1985.[10] As set forth in the amended complaint, these claims arise out of the following alleged events:

> a) Count 1, Foulk's unlawful advice and direction to law enforcement officials resulting in an unlawful invasion of plaintiff's home, unlawful harassment and infliction of distress on plaintiff's wife and young son, and unlawful arrest of plaintiff, ... b) Count 2, Foulk's knowingly and intentionally false, malicious, defamatory statements to the media resulting in injury to plaintiff's reputation and deprivation of plaintiff's rights as a citizen, ... c) Count 3, Foulk's unlawful initiation and prosecution of false criminal charges against plaintiff which Foulk knew to be groundless, both legally and factually, while Foulk faced an actual conflict of interest with plaintiff and therefore acted outside the scope of Foulk's authority, .... and d) [Count 4,] Foulk's conspiracy to commit the foregoing unconstitutional and unlawful acts in violation of plaintiff's constitutional rights as a citizen ...

(Amended Complaint [26] at ¶ 1 (internal citations omitted).) Plaintiff has since withdrawn Count 3 of the Amended Complaint; as to the remaining counts, Defendant has filed a motion for summary judgment which, having been briefed and argued, is now ripe for adjudication.

## II. DISCUSSION

Because each cause of action in the Amended Complaint arises from a separate set of events, we will discuss each legal theory and the relevant facts individually.

---

[10] We have jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

*Count 1*

Plaintiff's first cause of action is premised upon Defendant Foulk's alleged conduct in connection with Plaintiff's arrest on theft charges. Construing the evidence and all reasonable inferences arising therefrom most favorably to Plaintiff, the record establishes the following facts.

In late 2004 and early 2005, while Plaintiff was involved in proceedings before the Disciplinary Board, the Erie County District Attorney's office was considering filing criminal charges against Plaintiff relative to events arising out of his representation of several clients in Erie. Plaintiff's attorney for purposes of the disciplinary proceedings was Thomas Ceraso, Esq. (App. 272-276 [59-10]; 495 [59-15].) Though Mr. Ceraso never represented Plaintiff relative to any formal criminal proceedings (App. 91-92 [59-6]; 273-275 [59-10]), he became aware of the possibility that criminal charges might be filed against Plaintiff in Erie County and had occasion to speak to Foulk concerning that point on several occasions. (App. 278-280, 295 [59-10];321, 323-324 [59-11].) It was Mr. Ceraso's belief that criminal charges were not warranted, and he attempted to persuade Foulk to hold off filing the charges in the hopes that Plaintiff could gather enough money to make any necessary refunds to his clients. (App. 284-289, 294-295 [59-10].) Toward that end, Plaintiff was able to collect $5,000.00, which he gave to Mr. Ceraso to place in an escrow account. (App. 53, 81-87 [59-5]; 88-89 [59-6]; 295-296 [59-10].) While the claims of Plaintiff's clients exceeded $9,000.00, Plaintiff disputed that amount and maintained that he had earned at least a portion of the fees in question. (App. 52-53, 82-83, 86 [59-5]; 288, 296-298 [59-10].); In any event, the matter was never resolved and no payments were made to any of Plaintiff's clients from

the escrow account.[11]  (App. 81-87 [59-5]; 88-89 [59-6]; 297-300 [59-10]; 314-316 [59-11].)  Finally, on March 16, 2005, the criminal charges were filed against Plaintiff.

On Friday, March 18, 2005, Plaintiff's 10-year old son, Zachary, arrived home from school in the Highland Park section of Pittsburgh.  (App. 414 [59-13].)  Plaintiff was away trying a case in another county at the time and his wife was due home from work soon after Zachary's arrival.  About ten minutes after Zachary had arrived home from school, but before his mother arrived, three men wearing casual clothing approached the house.  (App. 384-385 [59-12]; 414, 416 [59-13].)  At least one of the men was employed by the Allegheny County Detective's Office (App. 67-68 [59-5]), and it can fairly be inferred that the other two were likewise county detectives or some other type of law enforcement agents.  The spokesman for the group rang the doorbell several times, and Zachary informed the man that he was not allowed to answer the door while his parents were away.  (App. 413-414, 417, 420 [59-13].)  The spokesman inquired about the location of Plaintiff's law office and Zachary gave him the address.  (App. 414, 417-418, 420 [59-13].)   While standing on a chair and looking out the peephole, Zachary was able to observe the spokesman wearing a sidearm and handcuffs. (App. 413-417 [59-13].)

Soon thereafter, Plaintiff's wife, Sharon, arrived home and parked her car at the end of the driveway, while the three men stood near the street.  (App. 382-386, 390 [59-12].)  The spokesman of the group approached her car and, as she lowered her window, stuck his head inside the vehicle.  (App. 383-384, 386-387, 391 [59-12].)  He advised Mrs. Hudak that he was there to arrest Plaintiff on charges filed in Erie.  (App. 386-387 [59-12].)  As Mrs. Hudak exited the vehicle, the man inquired about Plaintiff's

---

[11] The record suggests that the clients in question had successfully recovered the amount of their claims from the Pennsylvania Supreme Court's Client Security Fund.  (App. 87 [59-5]; 88-89 [59-6].)  According to Plaintiff, there was talk at one point about the escrowed money being applied toward a reimbursement to the Fund; however, no reimbursement ever occurred.  (*Id.)*

13

whereabouts. (App. 387 [59-12].) Mrs. Hudak advised the man that her husband was trying a homicide case out of town. (*Id*.) She offered to have Plaintiff call him later, and the man then handed Mrs. Hudak a business card containing his contact information. (App. 387-389 [59-12].) As Mrs. Hudak walked toward her house, the man remarked in a loud voice that Plaintiff had better get in touch with him or they would be back at the house to arrest Plaintiff. (App. 389-391 [59-12].)

Mrs. Hudak's entire encounter with the detectives lasted no more than five minutes. (App. 401 [59-12].) At no time during their encounters with Sharon and Zachary Hudak did the men physically threaten anyone, yell, or utter profanities. (App. 391-392 [59-12]; 421 [59-13].) However, Mrs. Hudak characterized the spokesman of the group as very rude, and she perceived that he was trying to intimidate her based on his loud tone of voice and the manner in which he leaned inside her car window. (App. 388-389, 391-392, 394 [59-12].) In addition, when the spokesman placed his hands on his hips, Mrs. Hudak had been able to observe his sidearm and handcuffs. (App. 393-394 [59-12].)

After this incident, Mrs. Hudak immediately telephoned Mr. Ceraso and eventually got word to Plaintiff that the detectives had visited their home looking for him. (App. 53 [59-5]; 310-311 [59-10]; 396, 399, 401 [59-12].) At some point late in the day, after he was out of court, Plaintiff contacted Foulk and spoke with him directly. (App. 53-54, 74-76 [59-5].) According to Plaintiff, Foulk was very apologetic about the charges being filed and claimed to be acting under a great deal of pressure. (App. 53-54, 57, 76-78 [59-5].) Plaintiff accused Foulk of acting at the direction of Judge Cunningham and, according to Plaintiff, Foulk, through his silence, implicitly "acquiesced" on that point. (App. 54 [59-5]; 90-91 [59-6].) Plaintiff then agreed to drive himself to Erie and turn himself in rather than face an arrest and possible detention in Pittsburgh. (App. 76-79 [59-5].) When Plaintiff arrived at the designated district justice's office in Erie, he was met by law enforcement officers, formally placed under arrest (though not handcuffed), and arraigned before the district justice, after which he

14

returned home directly to Pittsburgh.  (App. 80 [59-5].)  Plaintiff's first count asserts a cause of action against Mr. Foulk under 42 U.S.C. § 1983[12] for the alleged violation of his Fourth Amendment rights based on the foregoing events.[13]

As a general matter, a prosecuting attorney is absolutely immune from damages under § 1983 based on activities that are "intimately associated with the judicial phase of the criminal process."  *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  This includes, but is not limited to, a prosecutor's conduct in initiating criminal proceedings and advocating the state's case.  *See Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (prosecutor's activities in connection with preparing an information and motion for arrest warrant were protected by absolute immunity); *Bresko v. John*, 87 Fed. Appx. 800, 802, 2004 WL 180415 at **2 (3d Cir. Jan. 29, 2004) (state prosecutor was entitled to assert absolutely immunity with respect to his decisions in connection with plea bargaining); *Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 820 (E.D. Pa. 2001) (assistant district attorney absolutely immune with respect to her conduct in initiating judicial proceedings

---

[12] Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..."

42 U.S.C. § 1983.

[13] In fact, Plaintiff has alleged that these events also resulted in a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  While the circumstances surrounding Plaintiff's arrest arguably implicate Fourth Amendment issues, it is difficult to see – and Plaintiff has not explained – how Plaintiff's rights under the Fifth, Sixth, Eighth or Fourteenth Amendments are implicated.  Indeed, Plaintiff has made no attempt, either in his amended complaint or in his brief in opposition to summary judgment, to articulate any theory whereby the events of March 16-18, 2005 could have resulted in a violation of those particular rights.  We will therefore limit our analysis accordingly.

against the plaintiff, despite allegations that she fabricated evidence and charges against him).

Plaintiff contends that Foulk is not entitled to assert absolute immunity with respect to the events which transpired on March 18, 2006 because, according to Plaintiff, Foulk was not acting in his prosecutorial role at the time. The gravamen of his §1983 claim under Count 1 is that Foulk gave *"unlawful advice and direction to law enforcement officials* resulting in an unlawful invasion of [his] home, unlawful harassment and infliction of distress on plaintiff's wife and young son, and unlawful arrest..."* (Amended Complaint [26] at ¶ 1.) Plaintiff theorizes that it was Foulk himself who directed that law enforcement officers be sent to his home to arrest him there. In so doing, Plaintiff argues, Foulk stepped out of his role as a prosecutor and into the role of a police officer, thereby losing his entitlement to absolute immunity.

The problem with this theory is that Plaintiff did not suffer any injury of constitutional proportions relative to the events which transpired at his home, however offensive they might have been. There is no evidence in the record that law enforcement officers actually entered, much less "invaded," Plaintiff's home as is alleged in the amended complaint. Moreover, with respect to the encounter which took place between Plaintiff's wife and son and the law enforcement officers, Plaintiff concedes that he has no standing to assert any constitutional injury stemming from those events. In fact, there is no evidence that Plaintiff suffered any constitutional injury at all as the result of conduct carried out by the Allegheny County Detective(s). Here, the evidence is uncontroverted that, before he could be arrested in Pittsburgh, Plaintiff made contact with Foulk and agreed to surrender himself in Erie.

At oral argument, Plaintiff represented that his first cause of action is actually premised on his arrest in *Erie*, which he characterizes as an arrest without probable cause, or false arrest. Here again, Plaintiff maintains that Foulk acted outside his capacity as a district attorney in ordering or approving the arrest. However, this theory

fails to establish any legally tenable claim for false arrest under Fourth Amendment principles.

The tort of false arrest, whether pled as a common law tort or a violation of Fourth Amendment rights, is designed to compensate for damages incurred from the time of detention up until issuance of process or arraignment. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 888 (5th ed. 1984)). *See also Wallace v. Kato*, — U.S. —, 127 S. Ct. 1091, 1095-96 (2007) (the sort of unlawful detention remediable by the torts of false arrest and false imprisonment is detention without legal process; the tort therefore ends once the victim becomes held pursuant to such process, whether he is bound over by a magistrate or arraigned on charges). Claims for false arrest differ from the "entirely distinct" tort of malicious prosecution, "which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process." *Wallace*, — U.S. at —, 127 S. Ct. at 1096 (citations omitted) (emphasis in the original). *See also Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) (essence of malicious prosecution is the perversion of proper legal procedures) (citations omitted). Accordingly, "[i]f there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Wallace*, 127 S. Ct. at 1096 (citing Keeton, *supra,* §119, p. 888). "The relevant legal process [for purposes of establishing malicious prosecution] is typically an arrest warrant or a charging document." *Fernandez v. Stack*, No. 03-4846 (JAP), 2006 WL 777033 at * 8 (D.N.J. March 27, 2006).

To the extent Plaintiff bases his first count on the fact of his arrest in Erie, that cause of action must be analyzed as a claim for malicious prosecution. Here, it is undisputed that the criminal complaints and applications for arrest warrants were filed on March 16, 2005. Two days later, after the warrants had been issued and after

detectives unsuccessfully tried to locate Plaintiff at his home, Plaintiff surrendered himself in Erie. He was arrested outside of the district justice's office, was arraigned forthwith, was released on unsecured bail with certain conditions, and thereafter returned home to Pittsburgh. Based on this record, it is undisputed that Plaintiff's arrest occurred only after legal process in the form of the criminal complaints and accompanying arrest warrants had issued; thus his Fourth Amendment claim, if any, is in the nature of malicious prosecution and not false arrest. *Cf. Wallace*, 127 S. Ct. at 1095-96 (tort of false arrest or false imprisonment served as the proper analogy for civil rights plaintiff who was complaining of allegedly unlawful detention based on his warrantless arrest); *Mantz v. Chain*, 239 F. Supp. 2d 486, 502 (D.N.J. 2002) (where plaintiff's arrest was not made pursuant to a warrant and occurred prior to filing of the criminal complaint, it could not serve as the basis for his malicious prosecution claim); *Mateiuc v. Hutchinson*, No. CIV. A. 97-1849, 1998 WL 240331 at *3 (E.D. Pa. May 14, 1998) (noting that a wrongful warrantless arrest may give rise to a false arrest claim but not a malicious prosecution claim).

Moreover, to the extent Plaintiff bases Count 1 on the fact of his arrest in Erie, the claim cannot overcome Defendant's assertion of absolute immunity. Though Plaintiff attempts to cast his arrest as a constitutional deprivation distinct from the initiation of criminal charges, it is clear that the two events are inseparable parts of the same alleged tort: the Fourth Amendment deprivation which Plaintiff claims to have endured when he was "seized" (i.e., arrested) in Erie occurred only because of Foulk's actions in approving the filing of criminal charges against Plaintiff. Plaintiff originally asserted a Fourth Amendment claim in the nature of malicious prosecution premised upon Foulk's alleged "unlawful initiation and prosecution of false criminal charges against [P]laintiff" in Count 3 of the Amended Complaint. (*See Amended Complaint* at ¶ 1). However, Foulk's conduct in filing and prosecuting the five criminal cases falls squarely within the ambit of protected, core prosecutorial functions. *See Bresko,* 87 Fed. Appx. at 803, 2004 WL 180415 at **2 ("It is well established that prosecutors enjoy

18

absolute immunity from suits under § 1983 for conduct related to the initiation and presentation of the state's case.") (citing *Imbler*, 424 U.S. at 431). Recognizing the difficulties with this claim, Plaintiff has since withdrawn Count 3,[14] thus forswearing any intention of challenging Foulk's conduct relative to the filing of criminal charges or the prosecution of the five cases against him. To now attempt to portray his arrest as a distinct constitutional tort is formalistic in the extreme. It would make no sense to hold that a prosecutor – who is immune from liability with respect to his decision to initiate criminal charges and to move the court for an accompanying arrest warrant, *see Kalina*, 522 U.S. at 129 – is nevertheless subject to liability because he directs or authorizes law enforcement to act on the arrest warrant once it is obtained. We conclude that, to the extent Foulk was personally involved in either directing or approving Plaintiff's arrest following the filing of the charges, this conduct was "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, and therefore receives the benefit of absolute immunity.

Plaintiff's case is easily distinguishable from the case of *Burns v. Reed*, 500 U.S. 478 (1991), on which he relies. In *Burns*, the Supreme Court was called upon to determine "whether a state prosecuting attorney is absolutely immune from liability for damages under 42 U.S.C. § 1983 for giving legal advice to the police and for participating in a probable-cause hearing." 500 U.S. at 481. The case arose out of a criminal investigation into the shooting of two boys, which occurred in their home. Police officers suspected that the boys' mother, Cathy Burns, had multiple personalities, one of which was responsible for the shooting. The officers sought advice from a state prosecutor as to whether they could interview Ms. Burns under hypnosis, and the prosecutor advised the officers that they could proceed. Ms. Burns subsequently gave a statement under hypnosis implicating herself in the crime and,

---

[14] Plaintiff represents that he withdrew Count 3 because he recognized that Foulk would assert the defense of absolute immunity as to that claim and because, even if the defense did not prevail, it would provide grounds for an interlocutory appeal.

upon being advised of the statement, the prosecutor advised the police that they had probable cause to conduct a warrantless arrest of Ms. Burns. The following day, the prosecutor appeared before a county court judge seeking a warrant to search Ms. Burns' house. During the hearing, the investigating officer testified that Ms. Burns had confessed to shooting her two children; however, neither the officer nor the prosecuting attorney informed the court that the "confession" had occurred under hypnosis and that Ms. Burns had otherwise consistently denied committing the shooting. After charges of attempted murder were filed against Ms. Burns and then later dropped, she sued the prosecuting attorney and others under § 1983. The Supreme Court held, in relevant part, that the prosecutor was not protected by absolute immunity relative to his conduct in providing legal advice to the police. It is this aspect of the Court's ruling upon which Plaintiff relies in arguing that Foulk should likewise be denied absolute immunity insofar as he authorized or directed law enforcement officers to place him under arrest.

Plaintiff's reliance on *Burns* is misplaced, however. Central to the Supreme Court's ruling in that case was its conclusion that the conduct in question, *i.e.,* "advising the police in the investigating phase of a criminal case" – was not "so intimately associated with the judicial phase of the criminal process" as to warrant protection by the doctrine of absolute immunity. 500 U.S. at 493 (citing *Imbler*, 424 U.S. at 430). The Court emphasized that "the concern with [vexatious] litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process." *Id*. at 494. As the Court explained,

> [a]bsolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation. ... That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.

500 U.S. at 494 (emphasis in the original) (internal citation omitted). The Court also expressed concern that "one of the most important checks [on prosecutorial abuse], the

judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police," *id*. at 496. This concern, the Court noted, is particularly acute in cases where the suspect is never charged. *Id*.

In the case at bar, Foulk's involvement in Plaintiff's arrest is distinguishable from the conduct for which absolute immunity was denied in *Burns*. At most, the record here shows that Foulk – having determined to initiate criminal proceedings against Plaintiff and having obtained arrest warrants on the charges from two different district justices – directed or authorized law enforcement officials to execute the warrants by taking Plaintiff into custody upon his arrival in Erie. There is no allegation here that Foulk gave advice of an investigatory nature to police officers, nor is it alleged that Foulk advised the police to make a warrantless arrest without the benefit of a neutral magistrate's imprimatur. Though Plaintiff describes Foulk's role as giving legal "advice" or "direction" to the arresting officers, it is clear that Foulk's involvement was far more intimately connected to the judicial process than was the prosecutor's conduct at issue in *Burns*. Legal process had already commenced by the time Plaintiff was arrested and, in effect, Foulk merely acted in his prosecutorial function to secure Plaintiff's appearance at the judicial proceedings. Accordingly, we do not read *Burns* as foreclosing Foulk's assertion of absolute immunity relative to the Plaintiff's arrest.[15]

Plaintiff's claim under Count 1 is also premised, in part, on the fact that, as a condition for release following his arraignment, he was required to execute an

---

[15] We can conceive of circumstances where absolute immunity would not protect a prosecutor relative to his conduct in connection with a suspect's arrest. As *Burns* demonstrates, a prosecutor is not necessarily protected by absolute immunity when advising police to effectuate a warrantless arrest. In addition, where a prosecutor is physically involved in executing an arrest or personally directs the manner in which an arrest is carried out, it may well be that absolute immunity would not protect the prosecutor from subsequent claims of excessive force. Under such circumstances, the prosecutor might be said to have stepped out of his role as an advocate and into the role of a peace officer. However, no such circumstances exist here.

unsecured signature bond and report to court telephonically on a weekly basis up until the time of trial. It is debatable whether these conditions suffice to establish that Plaintiff suffered a post-arraignment liberty deprivation of constitutional proportions. *See Kingsland v. City of Miami,* 382 F.3d 1220, 1235-36 (11th Cir. 2004) (plaintiff's requirement to pay $1,000 bond and defend herself in court was insufficient to constitute a seizure under the Fourth Amendment); *Golya v. Golya*, No. 3:CV-05-0100, 2007 WL 2301085 at * 6 (M.D. Pa. Aug. 9, 2007) (criminal defendant who was subjected to a $5,000 unsecured bail bond and standard release conditions following arrest, who was required to appear at arraignment and preliminary hearing and who was prohibited from having contact with the victim did not suffer a Fourth Amendment "seizure" sufficient to support a § 1983 claim); *Love v. Oliver*, 450 F. Supp. 2d 1336, 1343 (N.D. Ga. 2006) (plaintiff, who was released on bond after appearance before Magistrate Judge, did not suffer a "seizure" for Fourth Amendment purposes, despite the fact that she contested her charges and suffered from stress and anxiety as a result of criminal charges).

However, even if Plaintiff could demonstrate that his post-arraignment bail conditions constituted a "seizure" for Fourth Amendment purposes, once again his § 1983 claim based on that deprivation would necessarily be premised on a theory of malicious prosecution, not false arrest. To be precise, since Foulk was not personally responsible for the post-arraignment bail conditions, his putative liability would be based solely on his role in initiating and pursuing the criminal charges which gave rise to the bail conditions. With respect to this theory of liability, Foulk enjoys absolute immunity because, as we have previously discussed, his initiation and prosecution of criminal proceedings falls squarely within the prosecutorial functions for which absolute immunity is afforded. In any event, Plaintiff has foresworn any attempt to challenge such conduct by virtue of having withdrawn Count 3 of the Amended Complaint. Accordingly, Plaintiff's first cause of action cannot withstand summary judgment.

*Count 2*

Plaintiff's second cause of action under § 1983 is premised on statements that Foulk made to the local newspaper concerning the criminal charges filed against Plaintiff. In March of 2005, Erie Times News reporter Lisa Thompson ran a story entitled "Lawyer Faces Theft Charges," in which she disclosed the basis for the criminal charges filed against Plaintiff. As part of the story, Ms. Thompson quoted Foulk as remarking that "[s]ome folks clearly were not only defrauded of money, they were not provided adequate representation. That's a one-two punch on the whole system." (*See* App. 528 [59-150].) Plaintiff complains that this statement was knowingly and intentionally false, malicious, and defamatory and resulted in injury to his reputation and deprivation of his rights as a citizen. Plaintiff further claims that Foulk's statement was made outside his authority as a prosecutor and is not covered by absolute immunity.

Plaintiff's second cause of action is properly analyzed as a claim under § 1983 for alleged violation of his Fourteenth Amendment due process rights.[16] "The first step in analyzing a due process claim is to determine whether the 'asserted individual interest ... [is] encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (internal citations and quotations omitted) (alterations in the original). Where the asserted deprivation stems from reputational harm, the plaintiff must satisfy what has become known as the "stigma-plus" test: that is, he must demonstrate that he has suffered a stigma to his reputation *plus* deprivation of some additional right or interest. *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Hill v. Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (citing cases). Importantly, courts have clarified that "reputation *alone* is not an interest

---

[16] Although the amended complaint alleges that these events also violated his Fourth, Fifth, Sixth, and Eighth Amendment rights, Plaintiff has made no attempt to articulate a theory whereby these rights could be implicated by Foulk's statement to the newspaper. Because Plaintiff has not seriously pursued these theories, we need not consider them further.

protected by the Due Process Clause." *Hill*, 455 F.3d at 236 (quoting *Versarge v. Township of Clinton, New Jersey*, 984 F.2d 1359, 1371 (3d Cir. 1993) (emphasis in the original)).

To satisfy the "stigma" prong of the test, a plaintiff must demonstrate that the objectionable statement was (1) publically made and (2) false. *Hill*, 455 F.3d at 236 (citations omitted). Defendant does not contest this prong and the record could support a finding as to these elements.

To satisfy the "plus" prong of the test, Plaintiff must demonstrate that the defamatory statement resulted in some alteration of Plaintiff's legal status. *See Paul*, 424 U.S. at 708-09 (discussing the Court's prior ruling in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), and explaining that, where governmental action deprives an individual of a right previously held under state law, this kind of significant alteration in the individual's legal status, together with reputational injury, can "justif[y] the invocation of [Fourteenth Amendment] procedural safeguards."); *Baraka v. McGreevey*, 481 F.3d 187, 208  (3d Cir. 2007) ("Reputational harm can constitute a protected interest when coupled with an additional deprivation of a protected right or interest."); *Graham v. City of Philadelphia*, 402 F.3d 139, 142 n.2 (3d Cir. 2005) (To recover on a due process claim premised upon the alleged violation of a liberty interest in reputation, "a plaintiff must show a stigma to his reputation plus some concomitant infringement of a protected right or interest.") (quoting *Ersek v. Township of Springfield*, 102 F.3d 79, 83 n. 5 (3d Cir. 1996)); *Clark v. Township of Falls*, 890 F.2d 611, 619 (3d Cir. 1989) (pursuant to *Paul v. Davis,* "defamation is actionable under 42 U.S.C. §1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution.") (citation omitted).

The question thus becomes what kind of "alteration in status" will qualify as significant enough to satisfy the "plus" prong. Examples include the loss of one's right to purchase or obtain liquor in common with the rest of the citizenry, *see Constantineau*, 400 U.S. 433 (1971) (as discussed in *Paul*, 424 U.S. at 708-09), the loss of government

24

employment, *see Hill v. Kutztown*, 455 F.3d at 238 (at-will employment), and deprivation of property, *see Greenwood v. New York Office of Mental Health*, 163 F.3d 119, 124 (2d Cir. 1998) (clinical staff privileges).

Here, Plaintiff has failed to demonstrate any loss or change in legal status that could satisfy the "plus" aspect of the "stigma-plus" test.  He concedes that he is not making a claim for economic damage or lost income as a result of Foulk's statement. Indeed, the record here would preclude such a claim, as it is undisputed that Plaintiff's license to practice law was suspended at the time of Foulk's statement and remains so today.  And even if Plaintiff could show a loss of private income resulting from Foulk's statement, that would apparently not satisfy the "plus" requirement.  *See Clark v. Township of Falls*, 890 F.2d 611, 619-20 (3d Cir. 1989) (financial harm resulting from government defamation alone is insufficient to transform a reputation interest into a liberty interest); *Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir. 1987)(monetary harm resulting from the loss of clients did not constitute deprivation of a liberty interest).

Instead, Plaintiff seems to be claiming that Foulk's statement added a new dimension of harm to his reputation.  At oral argument, Plaintiff contended that his problems with the disciplinary board were perceived simply as a dispute over a Pittsburgh case that got "out of hand," whereas Foulk's statement to the press caused people to believe that Plaintiff had defrauded clients.  This theory does not suffice to establish the necessary "plus" factor.  In essence, what Plaintiff is complaining about is purely reputational harm as a result of Foulk's allegedly defamatory statement – albeit reputational harm to a greater degree.  This allegation is insufficient to establish a due process violation.

In his brief opposing the motion for summary judgment, Plaintiff also attempts to premise his second cause of action on statements made by First Assistant District Attorney Robert Sambroak, Jr..  Plaintiff argues in his brief that, after Judge Bozza dismissed three of the charges against Plaintiff, Sambroak falsely implied in the media that Plaintiff was still guilty of theft and stealing but that the D.A. simply could not prove

it.  As to the case involving Plaintiff's representation of Kelly Makela, Plaintiff complains that Sambroak falsely implied in the media that the case had been *nolle prossed* due to jurisdictional problems, as opposed to a lack of merit.

This line of argument is unavailing for several reasons.  For one, there is no evidence in the record to support Plaintiff's assertion that "Foulk disseminated [these statements] to the media through his employee, First Assistant District Attorney Robert Sambroak."  (Pl.'s Br. in Opp. to Def.'s Summ. Judg. Mot. [61] at p. 3 of 4.)  Sambroak made the statements to which Plaintiff objects, but he is not named as a defendant in this lawsuit.  Therefore, Sambroak's statements are not actionable.  Apart from that defect, the statements attributed to Sambroak were not pleaded as a basis for Plaintiff's federal claims.  Moreover, as a substantive matter, Sambroak's alleged statements would be insufficient as a matter of law to establish a violation of Plaintiff's due process rights for the reasons discussed in relation to Foulk's statement to the media.  Simply stated, Plaintiff cannot show that the objectionable comments satisfy the "stigma plus" test.  Accordingly, Defendant is entitled to summary judgment on Count 2 of the Amended Complaint.

*Count 4*

Plaintiff's last cause of action purports to state a claim under 42 U.S.C. § 1985 premised on the theory that Foulk conspired with Judge Cunningham to accomplish Plaintiff's arrest and, in so doing, violated Plaintiff's Fourth Amendment rights.[17]  As to this cause of action, Plaintiff has forsworn any intention to incorporate within his conspiracy claim a theory of liability premised upon malicious prosecution; rather, he bases his § 1985 claim solely on the alleged conspiracy to effectuate his arrest.

---

[17] Here again, Plaintiff contends that the objectionable conduct violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments as well.  Because Plaintiff has not articulated any theory whereby those rights would be implicated by the alleged conduct, we need not consider these claims further.

Section 1985 pertains generally to conspiracies to interfere with civil rights.  It has three subsections, none of which are specifically cited or referenced by Plaintiff; accordingly, it is not clear what subsection Plaintiff intends to invoke.  Nevertheless, because subsections (1) and (2) are patently irrelevant,[18] we assume Plaintiff intends to invoke subsection (3), which provides, in relevant part:

> If two or more persons ... conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

Here, the record does not support the existence of a viable claim under §1985(3) for several reasons.  For one, § 1985(3) requires, as an element of the plaintiff's cause of action, that the conspiracy in question involve an invidious form of discrimination.  *See Griffin v. Breckenridge*, 403 U.S. 88 (1971) (42 U.S.C. § 1985(3) prohibits conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus."); *Ridgewood Bd. of Ed. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253-54 (3d Cir. 1999) (To state a claim under § 1985(3), the plaintiff must allege "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons ... [of] the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or

---

[18] Subsections (1) and (2), respectively, make it unlawful to engage in conspiracies which are designed to:  (i) prevent a public officer from carrying out his official duties, 42 U.S.C. § 1985(1), or (ii) obstruct justice and intimidate a party, witness, or juror, § 1985(2).  No such allegations are involved here.

property or the deprivation of any right or privilege of a citizen of the United States.")
(quoting *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir.1997)).  No such allegations have
been raised here, nor could they be, based on the evidence of record.[19]

Moreover, Plaintiff's theory that his rights were violated when Foulk conspired
with others to effectuate his arrest is not a viable theory on this record because, as we
have previously discussed, this factual record cannot support a claim against Foulk for
false arrest.  Plaintiff's arrest occurred only *after* legal process had begun; his claim, if
any, must be premised upon a theory of malicious prosecution, not false arrest, but
Plaintiff has already foresworn any intention of pursuing a conspiracy claim based on
malicious prosecution.  To the extent Plaintiff *is* asserting that his Fourth Amendment
rights were violated by virtue of a conspiracy to institute unfounded criminal charges
against him, thus giving rise to his arrest, Foulk is entitled to absolute immunity.  Here,
the added allegation of conspiracy does not further Plaintiff's claim because courts
have held that simply averring that a prosecutor *conspired* to initiate unfounded criminal
charges is not sufficient to pierce the veil of absolute immunity that would otherwise
apply.

For example, in *Ashelman v. Pope*, 793 F.2d 1072 (9th Cir. 1986), the plaintiff
was a state prisoner who, while awaiting trial on criminal charges, filed a civil rights
lawsuit against a state court judge and county prosecutor, alleging that the two had
conspired to undermine his defense and fix the outcome of his trial.  The Ninth Circuit
Court of Appeals held that "a conspiracy between judge and prosecutor to predetermine
the outcome of a judicial proceeding, while clearly improper, nevertheless does not

---

[19] Section 1983 conspiracy claims, unlike those pled under § 1985, do not
require that the conspiracy be motivated by individious discrimination.  *See Ridgewood
Bd. of Ed. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999).  Nevertheless, Plaintiff
specifically references § 1985 rather than § 1983 both in his amended complaint and in
his brief opposing the instant motion.  Accordingly, as Plaintiff is an attorney trained in
the law, we take his claim as it is pleaded.  Even if we were to construe the claim as
one brought under § 1983, it could not survive summary judgment for the reasons set
forth, *infra*.

pierce the immunity extended to judges and prosecutors." 793 F.2d at 1078. In arriving at that conclusion, the court noted that "[t]he primary policy of extending immunity to judges and to prosecutors is to ensure independent and disinterested judicial and prosecutorial decisionmaking." *Id*. Effectuation of this policy, the court observed, would require that the immunity doctrine be construed broadly: "To foreclose immunity upon allegations that judicial and prosecutorial decisions were conditioned upon a conspiracy or bribery serves to defeat these policies." *Id*. The court therefore concluded that, notwithstanding allegations of conspiracy such as those raised by the plaintiff, prosecutors are absolutely immune for quasi-judicial activities taken within the scope of their authority – i.e., initiating a prosecution and presenting the state's case. *Id.*[20] *Accord Reasonover v. St. Lewis Cty.*, 447 F.3d 569, 580 (8th Cir. 2006) ("[A] prosecutor is absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts.") (citing *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1282 (11th Cir. 2002); *Schmueli v. City of New York*, 424 F.3d 231, 237-38 (2d Cir. 2005) (The nature of absolute prosecutorial immunity is such that it "accords protection from ... any judicial scrutiny of the motive for and reasonableness of official action," notwithstanding "allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy.") (internal citations omitted) (ellipsis in the original).

In fact, courts have recognized that a prosecutor's motives in initiating criminal proceedings are irrelevant for purposes of absolute immunity. *See Bernard v. County*

---

[20] In arriving at its ruling, the *Ashelman* court overruled its prior decision in *Beard v. Udall*, 648 F.2d 1264 (9th Cir. 1981), wherein the court had held that "where a prosecutor faces an actual conflict of interest and files charges he or she knows to be baseless, the prosecutor is acting outside the scope of his or her authority and thus lacks immunity." 648 F.2d at 1271 (footnote omitted). Plaintiff has relied on *Beard* in support of his assertion that, in initiating and prosecuting groundless criminal proceedings, Foulk acted under an actual conflict of interest and outside the scope of his authority and is therefore not protected by absolute immunity. Obviously, to the extent that *Ashelman* overruled *Beard*, Plaintiff's reliance on *Beard* is unavailing.

*of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (absolute immunity shielded prosecutors from suit for their alleged malicious or selective prosecution of plaintiffs, notwithstanding allegations that prosecutions were politically motivated); *Campbell v. Maine*, 787 F.2d 776, 778 (1st Cir. 1986) (no bad faith exception to absolute immunity of prosecutor); *Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 820 (E.D. Pa. 2001) (allegation that prosecutor fabricated evidence and charges were insufficient to overcome absolute prosecutorial immunity); *Elliot v. Perez*, 561 F. Supp. 1325 (E.D. La. 1983) ("[U]nder *Imber*, a prosecutor is absolutely immune from a civil suit for damages under 42 U.S.C. 1983 even if the action is undertaken maliciously, intentionally, and in bad faith.").

In sum, Plaintiff's claim under Count 4 of the Amended Complaint cannot survive summary judgment because the facts of record do not support any application of § 1985, because the record does not support a viable Fourth Amendment claim against Foulk premised upon false arrest, and because Plaintiff's allegation of conspiracy is insufficient to pierce the absolute immunity which Foulk is otherwise entitled to invoke. Accordingly, summary judgment will be entered as to Count 4 of the Amended Complaint.

## III.  CONCLUSION

Based upon the foregoing reasons, Defendant's motion for summary judgment will be granted in its entirety.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH E. HUDAK,          )

          Plaintiff,    )      Docket No. 1:06-cv-110-SJM

        v.           )

BRAD FOULK,           )

          Defendant.   )

## <u>ORDER OF JUDGMENT</u>

AND NOW, *to wit*, this 5th day of December, 2007, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's motion for summary judgment [59] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Brad Foulk, and against Plaintiff, Joseph E. Hudak, in the above-captioned matter.

          s/     Sean J. McLaughlin      

          SEAN J. McLAUGHLIN
          United States District Judge

cm:   All parties of record.